The **HANOVER FIRE INSURANCE COMPANY OF NEW YORK,** Appellant,

v.

**George D. ARGO, d/b/a Ruth's Shop,** Appellee.

No. 16802.

United States Court of Appeals
Fifth Circuit.

Dec. 6, 1957.

Rehearing Denied Feb. 21, 1958.

Horace E. Richter, LaGrange, Ga., Alex W. Smith, Jr., Smith, Field, Doremus & Ringel, Atlanta, Ga., for appellant, Alex W. Smith, Estes Doremus, Sam F. Lowe, Jr., Atlanta, Ga., of counsel.

Lewis R. Morgan, William P. Trotter, Wyatt & Morgan, James R. Lewis, LaGrange, Ga., for appellee.

Before RIVES, TUTTLE and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The Insurer undertakes the heavy burden here of contending that the evidence, much of it circumstantial, was such as to require a finding, as a matter of law, that extensive damage to the Assured's establishment, Ruth's Shop in LaGrange, Georgia, November 29, 1955, was due to a fire of incendiary origin caused or procured by the Assured. This is the position on the main question since the jury verdict for the Assured, upon instructions not complained of, was a holding that it was not an incendiary fire. A subsidiary contention, not so sweeping in effect or so awesome in the burden of sustaining it, is that at least there was insufficient evidence to warrant the Georgia statutory penalty and attorneys' fees for unreasonable refusal to pay the claim.

■ The Insurer does not minimize the difficulties of its task for it forthrightly recognizes that, on pleading and proof, the Assured made out a prima facie case for recovery of the insured loss, and that the burden is on it to prove—but by a preponderance of the evidence only—that the fire was an in-

cendiary one caused or procured, by the Assured,[1] Sundquist v. Hardware Mutual Fire Insurance Company, 371 Ill. 360, 21 N.E.2d 297, 124 A.L.R. 1375. But, as appealing as is this candor, we do not think that, either on principle or the cases so heavily pressed [2] by it, the Insurer can meet this challenge.

This conclusion greatly simplifies the recitation of the facts. For while we think that the evidence, even though circumstantial in part, in a devastating way demonstrates with great conviction —so much so that we can assume *arguendo* that a contrary conclusion could not be reached by a trier—that this fire was not accidental,[3] and was indeed purposefully set and incendiary in origin, the evidence linking the Assured to the fire is not of that character which would permit of but a single answer.

■ And this is crucial. For it is not that the fire is incendiary in origin that defeats recovery—it is that the Assured, either personally or through agents, has caused or procured the fire to be set.[4]

True, the Insurer again made out a powerful case which, had the jury so

1. The Assured, of course, agrees and cites additionally: Hanover Fire Insurance Co. v. Pruitt, 59 Ga.App. 777, 2 S.E.2d 123; American Fire & Casualty Co. v. Barfield, 81 Ga.App. 887, 60 S.E.2d 383; St. Paul Fire & Marine Ins. Co. v. C.I.T. Corp., 55 Ga.App. 101, 189 S.E. 390; Aetna Insurance Co., of Hartford, Conn. v. Taylor, 5 Cir., 86 F.2d 225; Woods v. Insurance Company of Texas, D.C.Alaska, 146 F.Supp. 82.

2. Wilson v. Aetna Insurance Co., La.App., 161 So. 650; as we have so often pointed out, with the unique fact-finding powers of the Louisiana appellate courts, opinions are frequently as much a recitation of fact-findings as an expression of legal holdings. British America Assurance Co. of Toronto, Canada v. Bowen, 10 Cir., 134 F.2d 256, and Westchester Fire Insurance Co. v. Tidwell, 199 Ark. 621, 135 S.W.2d 842, were each non-jury trials by the court with a markedly different appellate review.

3. We think it uncontradicted that four separate, disconnected fires broke out, three in widely separated hanger-stalls

typical of a women's wear store in which dresses are hung, and a fourth in a fitting or storeroom behind the main sales area separated by an ordinary partition. Each of these fires, while intense, did little damage to adjacent stalls or the clothing hanging in them, and next to one, light merchandise boxes and even delicate lingerie remained unscorched or damaged. The Fire Chief and fire department Captain were emphatic that none of these four fires were in any way connected, i. e., the flame progressing from one location to the other, and on the basis of a lifetime professional experience in fire fighting, one expressed the opinion that this fire was not accidental, that it had been set, and the other that he could not say it was accidental, i. e., non-incendiary.

4. For an Alabama case, we said, Orient Insurance Company v. Parkhill, 5 Cir., 170 F.2d 510, 511: "The defense of arson or willful burning will not operate to defeat recovery under a fire insurance policy where, as here, there has been no finding of knowledge, authorization, or ratification of any such burning by the assured."

found, would have been unassailable indicating motive and opportunity, and thus implicating the Assured in the incendiary fire. The insurance was doubled from $7,000 to $14,000 just ten days before the fire. The business, if not bad, was certainly not good. In its short life (March 18, 1955 to November 29, 1955), its total sales, a bare $8,900, after deducting cost of goods sold and rent only, left only an operating margin of $940.20 out of which to pay all salaries, other expenses and profit. Outstanding accounts payable for merchandise, fixtures and advertising exceeded $6,700. The Assured, Georga D. Argo, the husband of the operator of the store, normally unaccustomed to being, or being seen, in the vicinity of the business area late at night, was at the nearby police station within 45 minutes or an hour prior to the discovery of the fire. And his wife, the operator of the store, asserting that she alone had a key, was positive that she had locked the doors. Both doors were locked when the fire was discovered, and the firemen gained access by knocking in the back door.

But this and related evidence opened up several possible inferences. For example, Argo, the Assured, was a Georgia State Trooper and while this visit to the police station was apparently a rare one for him, at least his work made his presence there plausible. The insurance was increased because of additions to the inventory of merchandise and fixtures, and it was only a coincidence that the increase happened to be obtained in early November. While the business owed debts for merchandise, this was normal and the operator had not expected that the first year's operations would show much profit. Added to this was the categorical denial by both husband and wife that either had set the fire or, for that matter, had been in the store since Mrs. Argo locked it up at the close of the business day.

The jury certainly could have found that one or both of them alone had access to the store so that the incendiary fire must have been caused by actions of one or both of them. But we cannot say that reasonable men might not have concluded otherwise.

Neither was seen in the store at a time shown to be critical. The fact that Mrs. Argo alone had a key and had locked the doors which were found to be locked on the discovery of the fire does not rule out the possibility that some third person acting under any one of the many weird motivations of a pyromaniac or for some other reason had not entered the store by stealth and there purposefully set the destructive fires. The locks on the two doors were only vaguely described and, without more, finding the doors closed and apparently locked upon the discovery of the fire does not exclude the possibility that a third party could have gained access by forcing or artfully opening one of the locks.

■ In the choice of inferences the jury chose those of innocence and rejected those of criminal, unlawful implications. We may reject this finding only if we can hold that no reasonable person could have made such a choice, Marsh v. Illinois Central R. Co., 5 Cir., 175 F.2d 498; American Fidelity & Casualty Co. v. Drexler, 5 Cir., 220 F.2d 930. And to reach that state, we would have to hold that fair-minded men would necessarily and inevitably have to find that Argo or his wife, or one acting for them, and no *other* had entered the store and set the fire.

■ The result is that as to the face amount of the policy ($14,000), the verdict, as a matter of law, is not without support in the evidence, nor, on the crucial issue of the implication of the Assured is the finding so contrary to the weight of the credible evidence that denial of the motion for new trial amounts itself to an abuse of discretion,[5]

5. Kirby Lumber Corp. v. Laird, 5 Cir., 231 F.2d 812; Commercial Credit Corp. v. Pepper, 5 Cir., 187 F.2d 71; Whiteman v. Pitrie, 5 Cir., 220 F.2d 914; Complete Auto Transit, Inc., v. Floyd, 5 Cir., 249 F.2d 396.

and that being so, our function is at an end.

But it stands differently concerning the jury's allowance of damages and attorneys' fees under the Georgia Code[6] for bad faith failure to pay the claim within sixty days after the filing of proofs of loss on January 11, 1956.

■ Granted that, as Georgia views this statutory policy, "It is usually a question for the jury to determine whether the insurance company, in refusing to pay, acted in bad faith and subjected itself to the penalty and attorney's fee provided for by Code, § 56–706," Guaranty Life Insurance Co. v. Brown, 92 Ga.App. 847, 850, 90 S.E.2d 97, 99, the Georgia Courts have prescribed a definite standard concerning what "bad faith" is. " * * * 'Refusal of an insurance company "in bad faith" to pay means in Georgia a frivolous and unfounded denial of liability. If there is any reasonable ground for contesting the claim, there is no bad faith * * *,'" Pearl Assurance Co. v. Nichols, 73 Ga. App. 452, 455, 37 S.E.2d 227, 230. And whether there was any reasonable ground for contesting the claim is a matter which depends upon the circumstances existing when liability is declined or not admitted, and not by the event of the ultimate determination (here, by the jury verdict and judgment entered thereon which, for constitutional reasons, we have affirmed.) For, " * * * [T]he statutory punishment * * * is not inflicted merely for the reason that it turns out at the trial, there was, in reality, no reason for the delay. The question is, How did matters appear before the trial, as judged by a prudent and reasonable man seeking to find out the facts about an occurrence which it was his duty to investigate?" Independent Life & Accident Ins. Company v. Hopkins, 80 Ga.App. 348, 353, 56 S.E.2d 177, 182.

■ Under this standard, we are clear that reasonable men could not possibly say that the Insurer's action was frivolous or that a refusal to accept liability was patently without any reasonable foundation. On the contrary the facts concerning the incendiary origin of the fire, which we have briefly summarized and which are largely without dispute, were more than ample on which to justify declining liability. With such an abundant series of facts, both direct and circumstantial, based on the photographs and other evidence developed by the fire department public officials in their extended investigation of this fire, the Insurer had adequate grounds for not then accepting liability and for vigorously asserting thereafter the defense of incendiary fire even though it turned out to be unsuccessful.

■ The Assured convinced the District Judge that this defense of incendiary fire was raised so late that that circumstance was itself a sufficient predicate for the jury believing that it was all an after-thought, and hence put forward as a last minute makeweight when its earlier asserted defenses of false swearing in the proof of loss appeared doomed to failure. But we do not think the record sustains this at all.

The Insurer's first formal answer, timely filed, categorically denied that the fire,[7] as alleged, occurred. And when,

---

6. "The several insurance companies of this State and foreign insurance companies doing business in this State in all cases when a loss shall occur and they shall refuse to pay the same within 60 days after a demand shall have been made by the holder of the policy on which said loss occurred, shall be liable to pay the holder of said policy, in addition to said loss, not more than 25 per cent. on the liability of said company for said loss; also, all reasonable attorney's fees for the prosecution of the case against said company: Provided, it shall be made to appear to the jury trying the case that the refusal of the company to pay said loss was in bad faith." Georgia Code Ann. § 56–706 (1933).

7. The Insurer's contention, based on Bindell v. Kenton County Assessment Fire Insurance Co., 128 Ky. 389, 108 S.W. 325, 17 L.R.A.,N.S., 189, cited to the District Court, was that a fire deliberately set by the Assured is not a fire within the meaning of the policy.

long prior to the trial, the Assured served Request for Admissions under Fed.Rules Civ.Proc. rule 36, 28 U.S.C.A., the Insurer spelled [8] out the contention then and ever since made that this was an incendiary fire.

Then occurred an unusual thing which, if it brought confusion into the case, was certainly of the Assured's own making. For the Assured successfully urged to the Court that these responses to the Requests for Admissions could not stand [9] because the defense of incendiary fire had not been specifically pleaded. This was to put cart before horse and to forget that one of the principal functions of the flexible tools of pre-trial discovery, including Request for Admissions, is, not to *conform to* pleadings, but actually to supplement, clarify and elaborate them.[10]

But whatever this amounted to, or whether the Court was or was not in error in doing it, both the eradicated answer and the Court-inspired substitute made plain that the Insurer was then contending, as it continued thereafter to do, that the occurrence was not a "fire" because it was incendiary in origin and caused or procured by the Assured.

In the face of the initial pleading and this emphatic notice in September 1956, the fact that leave formally to amend the answer to allege this specifically as an affirmative defense was not sought (and allowed under F.R.Civ.P. 15(a)) until a few days before the trial on April 24, 1957, in no sense gave either the jury or Court ground for thinking this substantial defense an afterthought or a bad faith, desperate last minute hope.

Applying the same standards then which maintained the vitality of the jury verdict on the main cause, we hold that reasonable minds could only conclude that, whether ultimately successful or not, the defense of incendiary fire was not a frivolous one and had substantial if not overwhelming, support in the facts then known to the Insurer. It was thus not for the jury, and that part of the

8. The Assured's Request for Admissions were:
   "Par. 6—That on the 29th day of November 1955, a fire occurred on and in the premises of Ruth's Shop located at No. 7 East Court Square, LaGrange, Georgia.
   "Par. 7—That on the 29th day of November, 1955, the fire which occurred on and in the premises of Ruth's Shop located No. 7 East Court Square, La-Grange, Georgia, damaged the contents, furniture and fixtures of said Ruth's Shop."
   To these, the Insurer responded:
   "Par. 6—In response to request No. 6 defendant denies that there was a fire within the meaning of the loss covered by the contract of insurance and further says that said loss, if any, was of incendiary origin and that said burning was caused by the plaintiff or at his direction.
   "Par. 7—In response to request No. 7 this defendant answers the same as to request No. 6."

9. The upshot of it was that the Court ordered the Insurer's responses, note 8, supra, stricken and the following was ordered substituted by the Court:

"The defendant admits that on the 29th day of November, 1955, there was a fire and burning of the premises of Ruth's Shop, in which the shop and its contents were destroyed by fire, but this defendant denied that there was a fire within the meaning of the policy of insurance here involved."
   The last phrase expressly carried forward the thesis of the Bindell case, note 7, supra, urged specifically in briefs to the District Court.

10. Hickman v. Taylor, 329 U.S. 495, 500, 67 S.Ct. 385, 388, 91 L.Ed. 451, 457: " * * * Under the prior federal practice, the pre-trial functions of notice-giving, issue-formulation and fact-revelation were performed primarily and inadequately by the pleadings. * * * The new rules, however, restrict the pleadings to the task of general notice-giving and invest the deposition-discovery process with a vital role in the preparation for trial. The various instruments of discovery now serve (1) as a device * * * to narrow and clarify the basic issues between the parties, and (2) as a device for ascertaining the facts * * * relative to those issues." And see Moore's Federal Practice, § 26.02 [1].

verdict and judgment is set aside and judgment rendered [11] for the Insurer.

Affirmed in part.

Reversed and rendered in part.

---

[11]. As the whole record as printed was essential to a determination of the question of bad faith penalties for delay, the costs for preparation and printing of the record are adjudged against the Assured; the remainder of costs are apportioned on the ratio which that part of the District Court judgment affirmed by us bears to the original judgment.